Filed 2/22/23  P. v. Dailey CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092885 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE022255) |
| v. | |
| MYRON SARAHN DAILEY, | |
| Defendant and Appellant. | |

Defendant Myron Sarahn Dailey shot and killed his uncle Michael Dailey after a simmering dispute between the two boiled over.  Defendant never denied killing his uncle, but instead asserted at trial the killing was done in self-defense after Michael confronted him regarding defendant's relationship with Michael's mother, defendant's grandmother.  Central to defendant's defense was establishing Michael's violent personality and defendant's belief he was at imminent risk of death.  The jury found defendant guilty of second degree murder and found true a gun arming allegation.  Defendant was sentenced to 35 years to life.

1

On appeal, defendant alleges several grounds for reversible error. He claims (1) the prosecutor improperly commented on defendant's post-arrest silence; (2) the trial court erred in excluding some evidence of Michael's violent character; (3) the trial court erred in disallowing the admission of evidence to impeach a witness; (4) the trial court erred in permitting the prosecution to introduce gang evidence; (5) the trial court erred in permitting the admission of an interview his aunt had with police; (6) the prosecutor committed prejudicial misconduct; (7) the trial court erred in giving three unsupported consciousness-of-guilt instructions; and (8) the cumulative impact of these errors denied defendant due process and a fair trial. Finding no prejudicial error, we will affirm.

BACKGROUND

Defendant's trial began on June 24, 2019, and involved 27 witnesses, who testified to the following facts. Alma Jean Dailey-Bell's five children were Michael, Phyllis Watson, Jo-vonn Dailey, Myra Dailey, and Darian Dailey.[1] Defendant is the son of Myra, so the grandson of Alma Jean and nephew of Michael. Defendant had lived with Alma Jean for a couple of years, and she gave him full access to use her car. Some of Alma Jean's children felt defendant was taking advantage of her. This included Michael, who took it upon himself as the oldest son to confront defendant.

On November 25, 2016, Michael went to Alma Jean's house to speak with defendant and the two ended up fighting. The following day, the family had planned a family meal at a local restaurant. Defendant and Michael argued at the restaurant and an employee asked them to leave; defendant left on foot while Michael drove away. They both ended up in front of Alma Jean's home, outside on or near the sidewalk, where defendant pulled out a gun and, standing approximately five feet away, shot and killed Michael. Multiple witnesses to the shooting testified that defendant kept firing even after

---

[1]     Given the similarity of last names, we shall refer to the family members by their first name.

Michael fell to the ground. A recording from a transit bus's surveillance video was played for the jury and on this video, a set of gunshots can be heard, a pause of at least one second, and then more gunshots. Defendant then walked away from Michael's body towards the nearby apartment complex.

Police found six cartridge casings at the scene. Police recovered defendant's gun in Alma Jean's house where defendant had told them it would be. But police did not locate any other gun on the scene and there was no indication Michael ever had a gun. Michael died from a gunshot wound through the chest, and also had gunshot wounds to his right armpit and left forearm, hip, and shoulder.

Defendant testified at trial and said Michael was violent. Defendant explained Michael was convicted of manslaughter after he "savagely bludgeoned" someone to death. Though this crime occurred before defendant was born, he was aware of Michael's violent nature and had witnessed several incidents of Michael's violence, knew Michael had a gun, and knew Michael often wore fingerless "cage fighter gloves" Michael would call his "murder ones."

Defendant testified that, on the day before the shooting, he was home, where he lived with Alma Jean, getting out of the shower when he heard loud banging on the door. He opened the door with just a towel on and Michael stormed in wearing his cage fighter gloves and started punching defendant while demanding the keys to Alma Jean's car. Defendant got up and tried to find the keys, but Michael became impatient and tackled defendant into a closet door, breaking it, and then continued assaulting defendant. During the assault, defendant said Michael told him, "if we wasn't in Nana [*sic*] house, I'd kill you right now."

Defendant was able to get away and find the keys and gave them to Michael, who then left. Defendant had some bruises and scratches, which were later photographed and shown to the jury, and the next day it hurt to breathe deeply and lift his right arm. Defendant testified he had a gun in the house at the time but did not think of getting it or

3

fighting back because he never thought about hurting his uncle. And on cross-examination, defendant confirmed that he did not believe any of his injuries were life threatening and that he never went to a hospital.

Defendant said the following day, November 26, 2016, Michael called and told him: "I'mma be back over there. Make sure you got some clothes on this time." Defendant understood this to be a threat, so he decided to walk to the restaurant where his family was meeting to avoid Michael coming to the house. Shortly after defendant arrived at the restaurant he noticed Michael, who was upset because he thought defendant was ignoring him in the restaurant. Defendant asked a restaurant employee to remove Michael, but she asked them both to leave. Defendant decided to leave and walked back home. Right before he entered the apartment complex, he heard "tires slipping" and saw it was his grandmother's car pulling up about eight feet from him in the bike lane. Defendant testified he then saw Michael in the car making movements like he was "grabbing something from underneath his seat and put it in his waistband."

Michael then jumped out of the car wearing his cage fighting gloves and said something to the effect of, "[N-word] you ain't going home. . . . Remember what I said? We ain't at Nana [*sic*] house no more." Defendant remembered that Michael previously said he would have killed defendant if they were not at Alma Jean's house. Right after Michael said this, he moved his hand toward his waistband. Defendant was convinced Michael had a gun and defendant testified, "[a]t that moment, I perceived my life to be in imminent danger," so defendant shot Michael. Defendant remembered only firing the first shot, but did not dispute the evidence that he fired all ammunition in the gun.

Defendant said he was in shock after the shooting but that his first thought was to call a paramedic for Michael, so he went into the apartment and called 911. He also secured the gun and turned himself in, telling police where the gun was.

Defendant was charged with murder with the allegation he personally and intentionally used a firearm. The jury was instructed on first degree murder, second

4

degree murder, voluntary manslaughter through imperfect self-defense, and justifiable homicide through self-defense.  The jury retired for deliberations on the evening of July 17, 2019.  On July 18, the jury requested the read back of testimony and asked several questions, including for the "legal definition of great bodily injury."  Later that day the jury informed the trial court it was deadlocked.  The court recalled the jury and told them that since one juror was leaving for vacation the following Monday, July 22, that juror would be excused, an alternate would be seated, and a new jury would begin deliberations at 1:00 p.m. that day.  The trial court then gave them the instruction to "begin your deliberations again from the beginning."  The jury informed the trial court that it had reached a verdict at 4:25 p.m. that same day, and the verdict was read on the morning of July 23, 2019.

On July 23, the jury acquitted defendant of first degree murder but found him guilty of second degree murder and found true an allegation defendant personally and intentionally discharged a firearm causing death.  The trial court sentenced defendant to 15 years to life for the second degree murder conviction and a consecutive 20 years to life for the firearm enhancement.

## DISCUSSION

### I

### *Post-arrest Silence*

At trial, the prosecutor questioned defendant regarding the fact he never told the police nor his family that Michael had a gun to argue defendant made this up to bolster his self-defense claim.  Defendant contends he had invoked his right to counsel so the prosecutor's questions and later closing arguments impermissibly relied on his post-arrest silence.  We find no error on this issue because the prosecutor was relying on inconsistencies in defendant's voluntary statements, not his silence.

5

A.    *Additional Facts*

During the prosecutor's cross-examination of defendant, she asked defendant about his post-arrest conversations with police and his family at the police station. He had told the police detective, "My uncle attacked me yesterday."[2] Defendant then described parts of the attack, the scratches left on his neck, that Michael "never liked me," and that "he attacked me today" after he "followed me home." The prosecutor asked defendant whether he ever told the detective that he saw Michael with a gun during the final altercation. Defendant maintained he did not because, "I think I told him I didn't want to speak without a lawyer."

The prosecutor then asked defendant about his post-arrest conversations with his mother, grandmother, and father. The prosecutor confirmed with defendant the details of the conversations and that he also never told them he saw Michael with a gun that day. With his father, defendant had detailed Michael's attack the previous day, that Michael had beaten him home after they left the restaurant, admitted that he had his gun on him at the restaurant, and that Michael told him, "you're moving your shit out today." Defendant confirmed he never told his father that he saw Michael with a gun.

In her closing argument, the prosecutor argued defendant "concoct[ed] this story about how Uncle Mike had a gun" in part because defendant failed to mention that Michael had a gun to either the detective or his family after his arrest.

B.    *Legal Standards*

Defendant specifically argues the prosecutor violated the protections articulated in *Doyle v. Ohio* (1976) 426 U.S. 610 when she improperly relied on his constitutionally protected right to silence. The United States Supreme Court in *Doyle* found that once an

---

**2**    The transcripts of defendant's conversations with police and his family were not entered into evidence. Instead, the prosecutor read these statements from those conversations and defendant confirmed his recollection during his testimony.

arrested person is given a *Miranda*[3] warning, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Id*. at pp. 617-618.) "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances." (*Anderson v. Charles* (1980) 447 U.S. 404, 408.) But it does not bar the use of omissions in statements made voluntarily after a *Miranda* warning because this does not implicate the invocation of the right to remain silent, but instead are "prior inconsistent statements." (*Ibid.*)

*Anderson* is particularly instructive. There, the defendant responded to police questioning about a car theft and murder after receiving *Miranda* warnings. (*Anderson v. Charles, supra*, 447 U.S. at pp. 404-405.) The defendant told police he stole the car from one location but at trial stated he stole it from another location, and the prosecutor noted this discrepancy. (*Id*. at pp. 405-406.) The United States Supreme Court found this did not invoke *Doyle* because the prosecutor's comments made "no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. [Citation]. [¶] . . . . [¶] . . . . Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." (*Id.* at pp. 408-409)

C.    *Analysis*

Defendant, like the defendant in *Anderson*, challenges the prosecutor's use of omissions from inconsistent statements made during the investigation, not defendant's silence. We do not have the benefit of the interview transcript and instead must rely on

---

**3**    *Miranda v. Arizona* (1966) 384 U.S. 436.

defendant's testimony regarding his conversation with police and his family. And defendant never said at trial when he was given his *Miranda* warning. But regardless of when this occurred, defendant voluntarily made the statements in question, and the prosecutor at trial questioned defendant on the inconsistencies between those statements and his testimony at trial. He claimed at trial Michael had a gun but the reasons he gave post-arrest for shooting Michael made no mention of Michael's gun. Just like in *Anderson*, even if defendant was given his *Miranda* warning prior to these statements, this is not improper questioning on constitutionally protected silence but inquiries into prior inconsistent statements voluntarily given. Holding otherwise would allow defendant the benefit of using his statements to bolster his defense without permitting the prosecution the opportunity to challenge the veracity of these statements. The fault in defendant's position is plain. (*People v. Collins* (2010) 49 Cal.4th 175, 203 ["*Doyle* does not apply when a defendant presents exculpatory testimony at trial inconsistent with a voluntary post-*Miranda* statement."].)[4] Consequently, there was no *Doyle* error from this line of questioning or its use in closing arguments.

II

*Evidence of Michael's Violent Character*

Defendant next challenges the trial court's exclusion of evidence of Michael's propensity for violence through certain specific acts, Alma Jean's testimony, and a police notice. Defendant asserts the exclusion of this evidence violated his constitutional right to present a defense. We find no abuse of discretion because the trial court properly considered the limited probative value of additional evidence of Michael's violent character.

---

[4]     See also, *People v. Thompson* (1986) 183 Cal.App.3d 437.

8

A.    *Additional Facts*

During a pre-trial hearing, defense counsel sought to introduce specific acts of Michael's violence. The trial court permitted the admission of six of these acts, which were: if defendant testified he could say that he knew Michael killed a man and was convicted in 1988 for voluntary manslaughter; on June 14, 2012, Michael threatened to beat up defendant's friend Jacoby James because James disrespected Michael; in March 2014, defendant and Darian were arguing and Michael said he was going to take them both to a field to allow them to fight it out; February 8, 2014, Michael punched someone after he thought they drove too close to him in a parking lot; on March 19, 2016, defendant was at Michael's home when Michael showed him a gun and said he's "too old to be wrestling with these young [n-word] anymore"; and around August 14, 2016, Michael yelled at and slapped defendant in the presence of Alma Jean. Defendant later testified to these incidents.

The trial court, however, excluded four specific acts. The first was on July 5, 2005, when defendant saw Michael punch another person because Michael felt the person disrespected him. The court found this was too remote because defendant was 13 years old at the time. Second, on or about September 9, 2016, Michael's daughter told defendant that Michael had beat up and choked the father of her daughter over a dispute. The court disallowed this through defendant's testimony because it was not reliable because the violence was not against him, but would address it again if Michael's daughter testified; she did not testify at trial. Third, in May 2016, defendant's mother warned him to be careful and not anger Michael, giving an example of when she was a child Michael got into an argument with their father, and their father had to pull a gun and shoot at Michael. The trial court found this was also too remote. Fourth and finally, in July 2014, at a family gathering Michael was celebrating his criminal history being expunged and said something to the effect, "I'm free to start all over again and kill again and get away with it." The court found this was "less probative."

9

The trial court also explained to defense counsel that "we have to deal with the cumulative nature of this as well, and I think you're getting in a lot of information that you can argue. You can make some good arguments with the self-defense instruction." The court also clarified that the defense "can still present reputation or opinion evidence from the family," but the family "can't get into specific acts."

During the trial, defense counsel asked Alma Jean on cross-examination about Michael's temperament. She agreed some members of her family, including Michael, did not like that she was so kind and accommodating to defendant. She explained Michael felt one should respect people older than you, "and he felt very strong about that, and he would react in a strong way." Defense counsel asked her what she meant by in a "strong way," but the prosecutor objected, and the trial court sustained the objection because it was "[b]eyond the scope." She then testified she thought Michael believed defendant was disrespecting her but said, "I didn't agree with it. And I wouldn't have agreed with it to him, because I know he would have overreacted." Defense counsel asked what she meant by "overreacted," but the prosecutor objected on grounds of speculation, which the trial court again sustained.

During a break outside the presence of the jury, the parties discussed the objections. Defense counsel stated, "I agree with the Court that to get into propensity for violence, character, things of that nature, as we discussed in limine, I would have to call [Alma Jean] as my witness. [¶] I believe that my questions were tailored and focused on responding to what was brought out on . . . direct examination." The prosecutor called Alma Jean again to testify as a rebuttal witness, but the defense never called Alma Jean.

Later in the trial, defense sought to admit a Sacramento Police Department internal document on Michael which included a caution note: "assaultive towards police, general caution advised, deceased." (Boldface & capitalization omitted.) The trial court did not permit the admission of this document, finding it had "very little, if any, probative value" because Michael's manslaughter conviction was going to be admitted and the defense

10

could ask law enforcement any other questions about their investigation.  The court also found it was outweighed by "confusion and use of the Court's time."

B.    *Legal Standards*

Evidence of a person's character is generally inadmissible to prove his conduct on a specific occasion.  (Evid. Code, § 1101, subd. (a).)[5]  One long-recognized exception to this rule is " 'where self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible.'  [Citations.]  Under Evidence Code section 1103, such character traits can be shown by evidence of specific acts of the victim on third persons as well as by general reputation evidence. . . .  The admission of such character evidence, however, is not without bounds, but is subject to the dictates of Evidence Code section 352."  (*People v. Wright* (1985) 39 Cal.3d 576, 587.)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time."  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  "[A] defendant has no constitutional right 'to present all relevant evidence in his favor, no matter how limited in probative value.' "  (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 450.)  So "[w]hen a proffer contains some proof of high value mixed with other less vital material, it is traditional and proper under [Evidence Code] section 352 for a trial court to tailor the presentation in a discretionary way." (*People v. DelRio* (2020) 54 Cal.App.5th 47, 57.)

We review a trial court's evidentiary rulings for an abuse of discretion.  (*People v. Davis* (2009) 46 Cal.4th 539, 602.)  A trial court will not be found to have abused its discretion unless it " 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'  [Citation.]"  (*People v.*

---

[5]     Undesignated statutory references are to the Evidence Code.

*Ledesma* (2006) 39 Cal.4th 641, 705 (*Ledesma*).) An erroneous exclusion of evidence warrants reversal only if it "resulted in a miscarriage of justice." (§ 354.) This occurs when " 'it appears reasonably probable that were it not for the trial court's incorrect evidentiary rulings, a result more favorable to [appellant] could have been obtained. [Citation].' " (*Bell v. Mason* (2011) 194 Cal.App.4th 1102, 1107.)

C.     *Analysis*

Initially, the trial court might have admitted some of the challenged evidence if defendant called proper witnesses. For the September 2016 incident involving the father of Michael's granddaughter, the trial court did not conclusively disallow admission of this evidence, stating instead it would revisit the decision if Michael's daughter testified. Similarly, defense counsel acknowledged it could ask Alma Jean more specifically about Michael's propensity if she was called as a defense witness. Defendant never called these witnesses or sought a final ruling on this evidence. Defendant has therefore forfeited appellate challenge to this evidence. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1181 ["To the extent that Sawyer failed to request a final ruling on the issue, as well as again tried to introduce the challenged evidence, the claim was forfeited."]; *People v. Cornejo* (2016) 3 Cal.App.5th 36, 56 ["By failing to press for a ruling . . . defendants have forfeited their . . . contention the trial court prejudicially erred and violated their due process rights by excluding the proffered evidence."].)

There was no abuse of discretion in disallowing the remaining character evidence defendant now challenges on appeal. Even if these acts were admissible as prior specific acts exhibiting Michael's character for violence, that is not the end of the analysis. The trial court had the discretion to consider all evidence defendant sought to introduce and its relative probative value compared to potential prejudice, including confusion of issues and consumption of time. The challenged evidence all suffered individually from limited probative value. The key to defendant's self-defense claim was Michael's violent nature at the time of the shooting, and specifically Michael's violence toward defendant. These

12

excluded acts either occurred long before Michael's death, involved violence against others, or were ambiguous as to their meaning which could confuse the issues.

The probative value was even more limited when considering the entirety of the evidence admitted to show Michael's violent nature. Most supportive of defendant's self-defense claim is the assault the day before the killing. Defendant testified Michael showed up unexpectedly and beat him, making threats that defendant understood to be threats on his life. This occurred the day before the deadly confrontation and involved the same motive, Michael's belief defendant was taking advantage of his mother. Given the timing, intensity, and motive, this specific act of violence against defendant supported defendant's self-defense claim much more than any of the excluded acts. The trial court also permitted the admission of Michael's prior conviction for voluntary manslaughter. Defendant described this killing as Michael "savagely beat[ing] a man to death." This was concrete evidence of Michael's capability to kill. None of the excluded acts had this potential; they were much less serious. Defendant also testified to Michael showing him a gun, hitting defendant at Alma Jean's house, seeing Michael beat up another person in a parking lot, Michael advocating defendant fight Darian, and hearing Michael threatening to beat up defendant's friend. These all have meaningful probative value in establishing not only Michael's violent nature, but Michael's violent nature toward defendant near the time of the shooting. The excluded evidence would have provided very little, if any, additional value to defendant's case in comparison.

And for the same reasons, if we did assume error, any error in failing to admit this evidence would not have resulted in a miscarriage of justice. Because of the comparatively limited additional probative value of the excluded evidence, it is not reasonably likely the jury's consideration of Michael's violent nature would have been more favorable to defendant had the trial court admitted the evidence.

Defendant ultimately loses the forest for the trees. Though each piece of evidence he challenges could arguably be probative and non-prejudicial when viewed individually,

13

collectively the lack of probative value becomes clear. Defendant is not entitled to present every piece of evidence. Defendant is instead entitled to present probative and non-prejudicial evidence to support his self-defense claim. That is what happened. We, therefore, find the trial court did not abuse its discretion in not admitting the challenged evidence. And even if it did, defendant would not have been prejudiced.

III

*Limitation of Cross-Examination*

The trial court did not allow defense counsel to cross-examine a prosecution's witness with evidence of Michael's prior manslaughter conviction. Defendant contends this improperly limited his ability to impeach an important witness and prejudicially violated his constitutional rights to confront and cross-examine witnesses. We find no abuse of discretion because the conviction was eventually admitted.

A.    *Additional Facts*

Eric Stewart testified for the prosecution that he was Michael's best friend for over 30 years. Though he moved to Arizona in 2013, he still spoke to Michael almost every day, including the day he died. On that day, Michael told Stewart he had gotten in a "physical altercation" with defendant the day before and that defendant was the aggressor who started the fight, but that Michael "subdued" defendant. Michael also told Stewart he felt terrible about the fight and was going over to the house that day to resolve the situation because he loved his nephew.

On cross-examination, defense counsel asked Stewart whether Michael had a reputation for violence, and Stewart responded, "Absolutely not." Stewart explained "Michael was mild mannered. Mike got along with everybody."

After Stewart completed his testimony, and outside the presence of the jury, defense counsel asked the trial court to revisit its motion in limine ruling limiting the evidence of Michael's manslaughter conviction to only defendant's testimony. Defense counsel argued Michael's conviction should be used to impeach Stewart because he

14

testified he knew Michael for 30 years and he was not a violent man. The trial court denied the request, finding it was still too remote "in terms of current reputation, it is still remote. This is before your client was even born that he had that conviction. [¶] . . . I don't see a high probative value. And we're going to allow it in when your client testifies as to his knowledge. [¶] So I don't think that the reputation evidence that you yourself introduced requires that now you get to impeach him with the 1988 conviction."

B. *Legal Standards*

"The credibility of a witness may be attacked or supported by any party." (§ 785.) Character evidence's use for impeachment is another exception to the general prohibition against the use of character evidence. (§ 1101, subd. (c).) And though " ' "[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude" [citation], such latitude does not "prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance" [Citations.] ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 455.) Thus, "reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination." (*People v. Brown* (2003) 31 Cal.4th 518, 545.)

We also review the decision to limit cross-examination for abuse of discretion. (*People v. Royal* (2019) 43 Cal.App.5th 121, 149.) And " ' " '[u]nless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' " ' " (*People v. Gonzalez* (2021) 12 Cal.5th 367, 406.)

C. *Analysis*

Impeaching Stewart with Michael's previous conviction is unlikely to have changed the jury's impression of Stewart's credibility. Stewart testified he had known

15

Michael for 30 years and that he did not believe he had a reputation for violence. Confronting him with a conviction from 24 years ago is not significantly inconsistent with Stewart's testimony relating to Michael's reputation at the time of his death. The jury also learned of Michael's conviction when defendant testified, along with the several other specific incidents of violence discussed above. This included, most notably, the attack on defendant the day before the killing. Other family members, including Michael's mother, commented on Michael's temperament. The jury was able to consider this evidence when evaluating Stewart's credibility during deliberations, so defendant being disallowed from impeaching Stewart during his testimony with this one 24-year-old conviction would not have made a significant difference in the jury's evaluation. We, therefore, find the trial court did not abuse its discretion.

IV

*Gang References*

Defendant next argues the prosecutor insinuated defendant had gang affiliations that prevented a fair trial because there was "a real danger the jury improperly disposed of the reasonable doubt standard of proof and allowed the gang references to cloud their resolution of the issues." We find no prejudice from the limited and ambiguous gang references.

A.    *Additional Facts*

Defendant testified that he had the gun with him when he walked to the restaurant on the day he shot Michael because "[i]t was just the normal course of action if I was walking anywhere." He testified he got the gun in 2013 from Jacoby James, a close friend that had since passed away. On cross-examination, the prosecutor asked, "So you, of all people, know what gun violence can do; correct?" Defendant answered he did because James was "gunned down." The prosecutor then asked, "Jacoby James was gunned down in a gang homicide on May 10th, 2014; correct?" Defendant responded, "Whoa. I don't think it was a gang homicide," but the prosecutor asked, "Well, you

16

know that three people were arrested for that murder; correct?" Defense counsel objected and the question was not answered.

The prosecutor then asked defendant about his motivation for carrying the gun. The following exchange occurred:

"A. Well, I knew there were groups of people. I don't know specifically who– pinpoint each individual it was, but there's groups.

"Q. Groups of people that didn't like you or wanted to do you bodily harm?

"A. Possibly.

"Q. Who?

"A. I don't know. Whoever harmed [Jacoby James].

"Q. So you can't be any more specific about that, even though now your testimony is there might be groups of people out there that want to harm you?

. . .

"A. The thing is, [Jacoby James] couldn't name the people that killed him. So how would I be able to name the person that might decide to harm me one day?"

During a break outside the presence of the jury, defense counsel objected to the prosecution using the word "gang" and trying to paint defendant as a gang member. Defense counsel asked the trial court to strike all references to gangs, instruct the jury to not consider any gang evidence, and to say there is no evidence defendant is a gang member. The following day, defense counsel informed the court he had reconsidered the issue. He maintained his objections, but believed that providing instructions on the issue might bring "more unwanted attention to the issue" but "would ask the Court to order and instruct the prosecution not to make any further reference to any gang allegations in their argument." The court said it was open to an instruction but would respect defense counsel's wishes, and defense counsel confirmed it's "a tactical and strategic decision."

17

The court then ordered the prosecution not to use the word gang and the prosecutor agreed.

In her closing argument, the prosecutor used a hypothetical about a blue team "beefing" with a red team to explain implied malice murder. She said if the red team drives by a house known to have blue team members "and they spray up that house, and a member of the blue team is asleep inside and he's killed. That's a second degree murder with implied malice. . . . That's really not what we have here, because [defendant] intends to shoot and kill his uncle and he knows he's doing it when he's doing it." Defense counsel later argued to the trial court outside the presence of the jury that this hypothetical violated the court's order because, even if the word "gang" was not used, it was obviously in reference to a gang drive-by shooting. But for "tactical and strategic decisions" defense counsel was again not asking the court to do anything at the time about it. The prosecutor defended the hypothetical as a typical one used to describe implied malice murder, and she had said it did not apply to the present case.

B.   *Legal Standards*

Given its highly inflammatory impact, gang evidence creates a " 'significant danger of unnecessary prejudice.' " (*People v. Maestas* (1993) 20 Cal.App.4th 1482, 1498.) Consequently, the introduction of gang evidence is condemned if only tangentially relevant. (*People v. Jones* (2003) 30 Cal.4th 1084, 1115.)

Typically, improper admission of evidence is a violation of state law, and as such requires the defendant to establish "it is reasonably probable that a result more favorable to the defendant would have been reached had the trial court excluded the erroneously admitted evidence." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 170.) Defendant contends, however, the violation was so serious that it violated his federal constitutional rights to due process, "rendering his trial fundamentally unfair." If this was the case, reversal is required unless "the state can prove beyond a reasonable doubt that the error

18

did not contribute to the verdict." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229 (*Albarran*).)

Defendant relies on *Albarran* to argue for a heightened error standard. In *Albarran*, the defendant was charged with a gang enhancement, and extensive evidence was admitted at trial regarding defendant's gang involvement and his gang's criminal behavior, but there was limited evidence that the crime itself was gang motivated. (*Albarran, supra*, 149 Cal.App.4th at pp. 220-221.) The trial court granted the defendant's motion for a new trial as to the gang enhancement but not the underlying charges, determining the gang evidence was still relevant to prove motive and intent. (*Id*. at pp. 222, 226-227.) The appellate court disagreed this evidence was relevant to prove motive and intent, so it found the "prosecution presented a panoply of incriminating gang evidence" that "had little or no bearing on any other material issue relating to [the defendant's] guilt on the charged crimes and approached being classified as overkill." (*Id*. at pp. 227-228.) The dispositive issue then became whether this erroneous gang evidence was prejudicial, and the defendant argued for the heightened prejudice standard. (*Id*. at p. 229.)

The appellate court stated that to prove a deprivation of federal due process rights, the defendant "must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. . . . 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' " (*Albarran, supra*, 149 Cal.App.4th at pp. 229-230.) Given the extensiveness of the evidence, its irrelevance, and that it "was extremely and uniquely inflammatory," the appellate court found it was "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair" and was "not convinced beyond a reasonable doubt that the error did not contribute to the verdict." (*Id*. at p. 232.)

19

C.     *Analysis*

Though defendant's counsel withdrew his request for limiting instructions, we will assume, for purposes of this analysis, defendant did not forfeit his objection to this evidence. We will also assume the prosecutor's one-time use of the word "gang," questioning of defendant about the "groups," and hypothetical about red and blue teams constituted an admission of irrelevant gang evidence. Under these assumptions, we find any error would be harmless.

*Albarran* is readily distinguishable. Here, the sole mention of "gang" was the prosecutor asking defendant to confirm whether Jacoby James died "in a gang homicide." There was no other explicit mention of gangs, and this reference had no direct link to defendant. Unlike the extreme and inflammatory direct evidence that the defendant in *Albarran* was a gang member, here the jury had to make several unsupported leaps to find defendant was a gang member from this one reference. The jury would have to believe James did in fact die in a gang homicide—a fact defendant denied that James was in a gang because of his gang-related death, and that defendant was also in this gang because he was friends with James.

The other supposed gang evidence was even more ambiguous. The prosecutor's questioning of defendant regarding the "groups" he was afraid of made no references to gangs and would take another unsupported leap for the jury to make such a finding. And defendant was responsible for any connection the jury could draw from this testimony to gang membership. Defendant was the one who brought up the groups and testified that he had to protect himself against these groups that were out to get him. The prosecutor's line of questioning was, therefore, necessary to discern whether the motivation for defendant carrying the gun was self-defense or not. Defendant does not present any compelling argument on appeal why the prosecutor was not permitted to further examine defendant's given explanation for carrying the weapon that he used to kill Michael.

20

Finally, the prosecutor's closing argument also lacked inflammatory gang references. Even if the jury understood the "teams" analogy to be veiled references to gangs, the hypothetical was explicitly couched to explain implied malice murder, which the prosecutor said was "really not what we have here." She never implied the hypothetical had any relevance to the case, legally or factually, so this one inapplicable hypothetical did not render defendant's trial unfair. (See *People v. Davis* (1995) 10 Cal.4th 463, 538 [finding "there was no impropriety in the prosecutor's use of hypothetical examples to show that there are varying degrees of culpability even among capital murderers" where "[t]here was no suggestion by the prosecutor that he was referring to factual information outside the record"].)

We consequently apply the typical prejudice standard and find it is not reasonably probable defendant would have obtained a more favorable result had these references not been made. For the reasons already articulated, "gang" was said only once, and it would take successive unsupported assumptions for the jury to believe defendant was a gang member from this reference. The other two alleged gang references defendant challenges are even less likely to be prejudicial.

Overwhelming and uncontroverted evidence of defendant's guilt overcomes this limited possibility of prejudice. The lesser crime the jury was instructed on was voluntary manslaughter based on imperfect self-defense. The central factual issue facing the jury in deciding between second degree murder and voluntary manslaughter was whether defendant actually believed he was in imminent danger of being killed or suffering great bodily injury, as opposed to shooting with malice aforethought. (CALCRIM Nos. 520, 571) The great weight of the evidence indicated defendant did not believe he was in real danger.

The central evidence supporting the conviction is the complete lack of physical evidence Michael had a gun that day. As the prosecutor properly discussed, defendant also did not tell the police nor his family that Michael had a gun, further undermining his

21

trial testimony to the contrary. The evidence instead indicates Michael approached defendant in a similar manner as the day before, without a gun but wearing his cage-fighting gloves. Even assuming Michael did attack defendant the day before the killing in the vicious manner defendant testified to, defendant said he did not sustain any life-threatening injuries, never went to a hospital, and never felt endangered enough to get the gun he had in the house. The only material difference between the two encounters was that the second occurred in public, among other people, which is a significantly less vulnerable setting. (Cf. *People v. Alvarado* (2001) 87 Cal.App.4th 178, 186-187 ["[V]ictims of a residential burglary are more vulnerable because they are inside a structure rather than out in public. . . . [C]ommon experience reveals that people usually lower their guard at home . . . [A]t those very times, they are unsuspecting and particularly vulnerable to shock and surprise by an intruder."].) Defendant surviving a similar attack in the privacy of his home without any significant injury and without the need to protect himself with deadly force, severely undermines his self-defense claim that he believed his life was in danger when his uncle approached him in public in a similar manner the following day.

Defendant also did not act like he was responding to an imminent threat to his life. Witnesses that saw the shooting testified that they saw defendant continue shooting Michael even after he fell to the ground, when he was no longer a threat. This was supported by the recording from the transit bus, which we have the benefit of on review, where a pause is clearly heard between bursts of shooting. The police also located six casings and defendant conceded the evidence showed he fired every bullet in his gun. Continuing to shoot his neutralized uncle indicates defendant did not actually believe he was in imminent danger, but instead that he was shooting with malice aforethought.

Defendant tries to frame his case as close, relying on questions the jury asked the trial court and that the jury was deadlocked. It is not readily clear why the jury asked for the great bodily injury definition. But we need not solve this mystery because the trial

22

court subsequently dismissed a juror, so a new jury was empaneled and instructed to begin deliberations anew on July 22. (*People v. Brown* (1988) 46 Cal.3d 432, 461 [trial courts must "instruct the jurors to begin deliberations anew if substitution becomes necessary after the jury has begun its deliberations"].) This jury then reached a verdict within a few hours. It restarted deliberations at 1:30 p.m. on July 22 and informed the court it had reached a verdict at 4:25 p.m. So, if we were to analyze the jury's actions, it would lead us to conclude the jury was not particularly conflicted as to a verdict. But at a minimum, we find the circumstances surrounding the jury to not be particularly relevant to the inquiry. Instead, we rely on the evidence that strongly indicated defendant acted with malice aforethought.

Thus, defendant's attempts to make mountains of molehills does not persuade us. Instead, we conclude these limited and ambiguous "gang" references made during a trial that spanned three weeks, involved 27 witnesses, and supplied extensive evidence of guilt did not result in any prejudice. (See *People v. Parrison* (1982) 137 Cal.App.3d 529, 540 [finding no prejudice with "a single reference to gang membership" in a "two-week trial in which more than 30 witnesses testified"].)

V

*Hearsay Evidence*

We next consider the trial court's admission of Jo-vonn's taped interview with police to impeach Jo-vonn and Alma Jean. Defendant argues the trial court erred because this interview constituted inadmissible hearsay and double hearsay. The inconsistent statement hearsay exception does not apply, he contends, because Jo-vonn testified she did not remember the details of her interview, which is not inconsistent with the details of her interview. And the use of a statement about what Alma Jean told Jo-vonn was double hearsay without any applicable exceptions. The record supports a finding that Jo-vonn was being evasive, permitting the testimony to be admitted as an inconsistent statement.

23

A.      *Additional Facts*

During the direct examination of Alma Jean, the prosecutor asked whether she told Jo-vonn that defendant was making her feel "a little bit elder abused." Alma Jean said no, she never thought defendant was taking advantage of her.

During the direct examination of Jo-vonn, the prosecutor discussed what Jo-vonn remembered about the day Michael was killed. Jo-vonn began the discussion stating, "when we spoke in April, I told you I wasn't able to recollect a whole lot." The prosecutor asked her whether she wanted to testify, to which Jo-vonn responded she did not because it is "a difficult situation . . . I hate what's allegedly happened. I hate that. I love my nephew. I love my brother. . . Whatever allegedly happened and who I know [defendant] to be. . . He's not a murderer." Throughout the prosecutor's questions relating to that day, Jo-vonn responded, "I don't remember" or "It's hard to recollect." She remembered going to the police station, and said she would have answered their questions honestly, but did not recall or remember any aspect of the conversation with the police.

Over defense counsel's multiple objections, which the trial court overruled, the prosecutor read portions of the transcript from Jo-vonn's conversation with police, including text messages from Michael she showed the officers; Jo-vonn continued to not remember any of it. This also included describing to police conversations Jo-vonn had with other family members about defendant's abusive relationship with Alma Jean and that Michael had to "handle it." The prosecutor specifically asked whether she told the detective that Alma Jean "says she feels elderly abused." Jo-vonn again replied she did not recall saying that. During a break in Jo-vonn's testimony, the court explained to the parties it permitted the video of Jo-vonn's interview as impeachment to both Jo-vonn and Alma Jean, including the portion that Alma Jean told Jo-vonn she felt she was being "elderly abused."

24

The prosecutor played the video of Jo-vonn's interview for the jury and introduced it as evidence during a police detective's testimony.

In closing arguments, the prosecutor relied on Jo-vonn's statements to the detective and described Jo-vonn as "caught in this quagmire.  And so she comes in and she just says, 'I don't remember.' "

B.    *Legal Standards*

Hearsay evidence is admissible if the hearsay "statement is inconsistent with [the witnesses] testimony at the hearing."  (§ 1235.)  "Ordinarily, a witness's inability to remember an event is not inconsistent with that witness's prior statement describing the event.  [Citation.]  When, however, 'a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied.  [Citation.]  As long as there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper.' "  (*People v. Rodriguez* (2014) 58 Cal.4th 587, 633.)  A trial court implicitly finds evasion when it permits the admission of prior inconsistent statements from a forgetful witness.  (§ 402, subd. (c); *Ledesma, supra*, 39 Cal.4th at p. 712 ["The requisite finding is implied from the trial court's ruling."].)

Our Supreme Court applied this rule in *Ledesma*, where a witness testified she did not remember speaking with the defendant about a robbery or murder.  (*Ledesma, supra*, 39 Cal.4th at pp. 710-711.)  She did remember speaking to police and testifying at the preliminary hearing, but did not "remember what she testified about, and did not remember testifying that defendant had told her he had killed somebody."  (*Id*. at p. 711.)  She also testified, "she did not want to be in court."  (*Ibid*.)  Our Supreme Court affirmed the transcript's admission, finding the witness evasive because she consistently denied "being able to remember anything that defendant had told her, what she had told the police, or her prior testimony," so the record provided "a reasonable basis to conclude she was being evasive.  [Citation.]  She had been a friend of defendant's and admitted she

was reluctant to testify and had failed to appear at a previous hearing. She claimed that even reading her prior testimony in full and listening to a tape recording of her police interview did not refresh her recollection." (*Id*. at p. 712.)

C.    *Analysis*

We find *Ledesma* supports the trial court's implied finding here. Like the witness in *Ledesma*, Jo-vonn here remembered going to the police station, but did not remember anything about the conversation, even after being read numerous portions of the interview. She did not even recall showing to police the last text messages she received from her brother. Jo-vonn being defendant's aunt also provided an incentive for evasion. She testified she loved her nephew and did not want to be in court because it was a "difficult situation" to testify at her nephew's trial, whom she loved, for the murder of her brother. And she even stated she believed defendant was not a murderer. This is more than enough to establish a reasonable basis to believe Jo-vonn's memory lapses were the result of evasion, more than the evidence in *Ledesma*. Consequently, the trial court could properly admit the transcript to impeach Jo-vonn as a prior inconsistent statement.

Jo-vonn's statement to police that Alma Jean told her she was being "elderly abused" was also admissible. This was double hearsay, but hearsay within hearsay is admissible if there is an exception at each level of hearsay. (§ 1201.) Paired with the prior inconsistent statement exception, these two rules "permit admission of multiple hearsay where each hearsay level constitutes a prior inconsistent statement." (*People v. Zapien* (1993) 4 Cal.4th 929, 952.)

That is the case here. Alma Jean testified she did not tell Jo-vonn she was "feeling a little bit elder abused." The first level of hearsay is admissible because Jo-vonn's statement to the police about what Alma Jean told her was directly inconsistent with Alma Jean's testimony at trial. And the second level meets the exception for the reasons discussed above. Thus, Jo-vonn's double hearsay statement of what Alma Jean told her was also admissible. (See *People v. Zapien, supra*, 4 Cal.4th at pp. 953-954 [finding a

26

double hearsay statement admissible because "each level of hearsay constitutes a prior inconsistent statement"].)

VI

*Prosecutor's Conduct*

Defendant next contends the prosecutor committed prejudicial misconduct in two ways:  (1) through the improper injection of gang evidence; and (2) the "prosecutor exploited the court's evidentiary rulings and misrepresented the facts to the jury."  For defendant's first basis, he relies on the same facts and arguments expressed above relating to the "gang" references.  The second basis of defendant's claim involves an allegedly pervasive effort to undermine the trial through improper exploitation of the trial court's "erroneous" evidentiary rulings related to Michael's violent nature.  Defendant was limited in the number of examples he could testify to, so was forced to concede on cross-examination that the number of violent tendencies was "kind of sparse," and the prosecutor improperly emphasized this testimony throughout her closing arguments.

Defendant also acknowledges there was no objection at trial to prosecutorial misconduct but asserts this is not fatal given such objection would be futile in curing the harm because defendant already objected to the evidence to no avail and the "bell could not be unrung."  Defendant contends he suffered ineffective assistance of counsel if we find he forfeited his claim.

Because we have found the trial court did not err in admitting evidence and found no prejudice in the ambiguous gang references, we find the prosecutor did not commit misconduct.

A.      *Additional Facts*

As discussed above, during defendant's direct examination, he testified about Michael's temperament.  He said he learned from his grandmother that once Michael "is convinced of something that he's angry about, anybody can be a target. . . It was common knowledge amongst the family . . . [t]hat Mike was arrested for murder."  He explained

27

that Michael "savagely brutally beat a man to death." Defendant also testified to several specific acts related to Michael's violent character. Defense counsel asked defendant why he would hang out with someone with violent tendencies, and defendant responded: "Well, over the course of 24 years, I just mentioned probably, like, three different events. So that's kind of sparse." The prosecutor then objected, and a discussion was held off the record without any ruling on the objection on the record. Defendant then agreed with defense counsel's question that, notwithstanding Michael's faults, he was still defendant's uncle.

In closing arguments, the prosecutor mentioned multiple times defendant's testimony conceding that he thought the incidents of Michael's violent acts were "sparse" or "scarce." The prosecutor argued that this, with other evidence, established Michael had learned from his prison time and was no longer violent. Defense counsel challenged this characterization in closing as sparse, saying this was "just a sampling. [I]t was systematic. Every year, every number of months, he's doing something that we know of."

B. *Legal Standards*

Prosecutors are " ' " 'given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.) But prosecutors are held to a high standard of conduct, and a prosecutor's " " ' "intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " " (*Ibid*.) To preserve a claim of prosecutorial misconduct on appeal, the "defendant must generally object 'in a timely fashion—and on the same ground,' and must 'request[ ] that the jury be admonished to disregard the impropriety.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29.) A

28

defendant's failure to object is excused if a timely objection or admonition to the jury would have been futile. (*Hill*, at p. 820.)

C.    *Analysis*

As we have found no prejudicial error in the passing and ambiguous gang references, we similarly find no prejudicial prosecutorial misconduct resulting from these references. We therefore, reject defendant's first basis for alleged prosecutorial misconduct.

Similarly, central to defendant's second prosecutorial misconduct argument is the assumption evidence was erroneously admitted. As we have found that not to be the case, the prosecutor was well within her authority to vigorously argue admissible evidence. And this evidence was mainly defendant's own testimony that the acts were "sparse."

We are not persuaded by defendant's contention that he was forced to say the acts were sparse because of the trial court's evidentiary rulings. As analyzed above, it was not the trial court that limited relevant evidence, but the lack of probative relevant evidence that defendant presented. The trial court permitted evidence of specific acts of violence that were not remote and that were either against defendant or that defendant witnessed. If there were more acts meeting this requirement, the record indicates the trial court would have admitted them. The court did not force defendant to admit a sparse number of acts, he was instead forced by the apparent dearth of actual relevant acts.

Defendant also implies that he was prohibited from providing more context to his "sparse" statement. The record does not bear out this claim. It was *defense counsel* that asked the question and then did not follow up. The prosecutor objected to the question but for unknown reasons. Regardless, the objection was not sustained, and defense counsel appeared to follow up to clarify defendant still spent time with Michael because he was his uncle. There is no evidence that defense counsel could have not gotten clarity

on defendant's meaning of "sparse." Defense counsel also addressed this point in the closing argument, saying it was just a "sampling."

In short, we find no prosecutorial misconduct flowed from the non-prejudicial "gang" references and the prosecutor commenting on defendant's own statements freely made and ably defended.

VII

*Consciousness of Guilt Instructions*

The trial court gave the jury three consciousness of guilt instructions: CALCRIM Nos. 361, 362, and 372. These permitted the jury to make inferences against defendant if it found defendant failed to explain evidence against him, made a false statement, or fled from the scene. Defendant argues these instructions were erroneous and prejudicial.[6] The People counter that CALCRIM Nos. 362 and 372 were supported. They concede, however, that CALCRIM No. 361 was not appropriate because defendant "did not fail to explain or deny any evidence against him," but assert this error, or any other error, was harmless. We find any error in giving these instructions was harmless considering their permissive nature and the evidence supporting the conviction.

---

[6] Defendant also implies giving these instructions violated his due process rights under any circumstances. We reject this argument outright without discussion as our Supreme Court has routinely affirmed the constitutional validity of these instructions. (*People v. Hartsch* (2010) 49 Cal.4th 472, 505 ["On appeal, he argues at length that these instructions were unnecessary and argumentative, and allowed the jury to draw irrational inferences. We have repeatedly rejected these claims, and do so again here"]; *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 500-502 [summarizing cases affirming consciousness of guilt instructions].)

A.      *Additional Facts*

The CALCRIM No. 361 instruction stated if defendant failed to explain or deny evidence against him, the jury could consider the failure in evaluating that evidence.[7] During the initial discussions about the jury instructions, the trial court indicated it generally gave this instruction whenever a defendant testified.  Defense counsel reserved objection in case there was no such evidence, and the trial court said it would consider not giving the instruction if "there's absolutely no evidence. . . .  But generally it's up to the jury to decide that."  At the final discussion, defense counsel again objected because he didn't know of any evidence that defendant failed to explain.  The trial court responded, "And if the jury agrees with you, then they will read that instruction and say it doesn't apply.  That's why it has an if in front of it.  So I'm going to leave it in there."

The CALCRIM No. 362 instruction stated if defendant made a knowingly false or misleading statement before trial about the crime, this may be considered in determining guilt.[8]  During the initial jury instruction discussion, the trial court stated, "[s]o far I haven't heard of any false statements, but I'll leave it in until we get all the evidence."  At the final discussion, the defense objected to this instruction and the court stated, "[a]gain, this is an if.  I'm going to leave it in there."

---

[7]      The instruction in full stated:  "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove the defendant guilty beyond a reasonable doubt.  [¶]  If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

[8]      The instruction in full stated:  "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.  [¶]  If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance.  However, evidence that the defendant made such a statement cannot prove guilty by itself."

The CALCRIM No. 372 instruction stated if defendant fled immediately after committing the crime, the jury could consider he was aware of his guilt.[9]  Defense counsel initially objected to this instruction "because there's no evidence of flight.  There's evidence of leaving."  At the final discussion, the defense also objected to this instruction on the basis there was no evidence of flight.  The trial court found there was enough evidence that the jury could find defendant leaving the scene was motivated by a consciousness of guilt.

The trial court also gave CALCRIM No. 200, which included the statement: "Some of these instructions may not apply, depending on your findings about the facts of the case.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

B.     *Legal Standards*

A permissive instruction "leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof."  (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.)  Facts giving rise to a consciousness of guilt instruction need not be conclusively established; rather, there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference.  (*People v. Alexander* (2010) 49 Cal.4th 846, 921.)  But consciousness of guilt instructions are " 'not to be given every time a defendant testifies.' "  (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 606.)

---

[9]     The instruction in full stated:  "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled cannot prove guilt by itself."

C. *Analysis*

The trial court's stated practice of giving consciousness of guilt instructions every time a defendant testifies is improper. The instructions must be supported by some evidence that could lead to a reasonable inference. But whether that is the case here for the three challenged instructions need not be decided because we find it not reasonably probable defendant would have fared better had the trial court not given the instructions. (*People v. Pettigrew, supra*, 62 Cal.App.5th at p. 502 [applying reasonably probable error standard to erroneous consciousness of guilt instruction]; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1471-1473 [same].)

The risk of prejudice is inherently limited for permissive instructions because they do not require the jury to apply them in every circumstance. Instead, they state they apply only "if" the jury does or does not find certain evidence exists. The trial court also provided CALCRIM No. 200, and "[b]y instructing the jury to disregard inapplicable instructions, the trial court mitigated the potential for prejudice" resulting from these potentially erroneous consciousness of guilt instructions. (*People v. Pettigrew, supra*, 62 Cal.App.5th at p. 502.) As our Supreme Court observed, "We presume the jury followed the trial court's instructions. [Citation.] Therefore, if, as defendant asserts, the consciousness of guilt evidence was not relevant . . ., then the jury would have disregarded the instructions." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 933.)

And, for the reasons discussed previously, there was overwhelming and uncontroverted evidence of defendant's guilt. This overcomes any remaining theoretical risk the instructions prejudicially biased the jury. We consequently find any instructional error here harmless.

VIII

*Cumulative Error*

Defendant finally contends the cumulative impact of the errors alleged denied him due process and a fair trial. "Lengthy criminal trials are rarely perfect" so we "will not

33

reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill, supra*, 17 Cal.4th 800, 844.) For each of defendant's arguments we either found the issue did not result in error or found any possible error would have been harmless. Viewed collectively, there was no miscarriage of justice. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1009 ["The few errors that occurred during defendant's trial were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one."].)

DISPOSITION

The judgment is affirmed.

\s\ ,
McADAM, J.*

We concur:

\s\ ,
MAURO, Acting P. J.

\s\ ,
KRAUSE, J.

---

* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.